# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 14, 2009 Session

## AARON BENJAMIN RUTHERFORD v. SOUTHERN COLLEGE OF OPTOMETRY

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-001151-04      John R. McCarroll, Jr., Judge**

_____

**No. W2008-02268-COA-R3-CV - Filed December 28, 2009**

_____

The plaintiff/appellant voluntarily withdrew from graduate school when it became certain he would not successfully remediate a previously failed course. The school permitted the student to re-enroll the following academic quarter subject to several specific conditions of readmission. The school eventually dismissed the student after it determined that he had failed to earn a "C" or better in two audited courses, which it considered a violation of the student's readmission conditions. The student filed suit following his dismissal, but not until after he entered into an agreement resolving the underlying dispute. The school counterclaimed for breach of contract, damages, and enforcement of the parties' agreement. The jury determined that (1) the school violated its policies and procedures when it dismissed the student, (2) the parties agreed to settle any differences that they may have had as set forth in the proof, and (3) neither party violated the agreement. The trial court accordingly entered judgment in favor of the school. Finding material evidence to support the jury's verdict, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Amy J. Farrar and Donald Capparella, Nashville, Tennessee, for the appellant, Aaron Benjamin Rutherford.

James E. Conley, Memphis, Tennessee, for the appellee, Southern College of Optometry.

**OPINION**

**I. Background and Procedural History**

This appeal follows the unsuccessful attempt of Aaron Rutherford ("Rutherford") to obtain a Doctor of Optometry degree from the Southern College of Optometry ("SCO") in Memphis, Tennessee. Rutherford enrolled at SCO in the fall of 1999 and performed acceptably during his first three years, maintaining a 2.32 cumulative grade point average. Rutherford, however, encountered difficulty in the final quarter of his third year and received a failing grade. This failing grade subjected Rutherford to several possible consequences pursuant to school policy including outright dismissal or remediation.[1] SCO agreed to permit remediation of the failed course, but it soon became clear to SCO faculty that Rutherford would not receive a passing grade in his second attempt. Because a second failing grade in the remediated course would require automatic dismissal, SCO recommended that Rutherford voluntarily withdraw and reapply for admission. Rutherford accepted SCO's advice and withdrew.

Rutherford applied for and received readmission in the fall of 2003. The special conditions of his readmission, which school policy permitted if specified in writing, were several: (1) Rutherford would take a distinct schedule designed in consultation with faculty members to remedy his scholastic and clinical deficiencies, (2) he would begin the year on academic probation, (3) he would be required to remain in good standing, and (4) he would be required to obtain a grade no lower than a "C" in any course. SCO outlined these conditions in a letter from Charles Haine ("Mr. Haine"), Vice President for Academic Affairs and Professor of Optometry. Three courses referenced in the readmission letter were to be taken as "audit" courses.[2]

Rutherford returned to SCO with high hopes but faltered in the winter quarter of 2003. Rutherford placed his continued pursuit of a degree from SCO in jeopardy when he earned a "D" in one course, violating the terms of his readmission. SCO again declined to dismiss Rutherford and instead permitted him to continue his education on academic probation. SCO's leniency wore thin when Rutherford failed two audited courses the following quarter. SCO's Faculty Student Affairs Committee eventually dismissed Rutherford for failure to comply with the special conditions of his readmission. The committee's interpretation of Rutherford's readmission requirements – the

---

[1]SCO policy defines remediation as the process by which "[u]nder certain circumstances a student who fails a course may be allowed to resolve the failure through individual remedial instruction in the immediately following quarter." Approved students are allowed to retake a failed course subject to additional requirements imposed to address the student's deficiencies. The student receives a second grade that appears alongside the initial failure on the student's transcript. A second failing grade, however, results in automatic dismissal.

[2]The parties later agreed that Rutherford would audit a fourth course due to conflicts in his schedule. SCO maintained that Rutherford should have received a grade in this audited course despite the fact that SCO faculty could not recall another student being required to take and pass courses taught at conflicting times.

interpretation that SCO maintained throughout this case – was that Mr. Haine's readmission letter obligated Rutherford to make a "C" or above in all courses including those audited.

Rutherford appealed his dismissal to Joseph Hauser ("Dean Hauser"), SCO's Dean of Students, arguing that dismissal for failure to obtain a "C" in two audited courses was contrary to school policy and inconsistent with the terms of his readmission.[3]  Rutherford presented two "acceptable resolutions" to the appeal of his dismissal:

1.    I begin my fourth year at SCO immediately and be re-instated as a regular student in good standing.  My fourth year will consist of four, mutually agreed upon, off-site externships.  Due to the history of unfair treatment I have received at SCO, I do not believe that I would receive a fair grade working at SCO's clinic.

2.    My dismissal is revoked, I receive a letter of recommendation from SCO's President by July 3rd, and my transfer to another institution is facilitated.  My student record will indicate that I left SCO in good standing, since I completed the 2003 spring quarter with a 3.0 quarter GPA.

Rutherford's letter, which he also delivered to Dr. William Cochran ("Dr. Cochran"), President of SCO, further explained that the above-quoted options were the only two acceptable resolutions to his appeal.

Dr. Cochran soon thereafter met with Rutherford to discuss his dismissal.  Dr. Cochran declined to reinstate Rutherford as a fourth-year student and decided against authoring a letter of recommendation on Rutherford's behalf.  Dr. Cochran alternatively proposed to revise Rutherford's transcript to show that he had withdrawn from the school and to provide Rutherford a letter of good standing.  Rutherford incorporated the terms of Dr. Cochran's counteroffer into a letter dated June 30, 2003.  Rutherford's second offer to resolve the parties' dispute, as expressed in his June 30th letter to Dr. Cochran, requested that Dr. Cochran rescind his dismissal, change his status to withdraw passing, write a letter of recommendation stating that he remained in good standing, and ensure that no one associated with SCO would impede his transfer or application to other schools.

Dr. Cochran accepted Rutherford's second offer in a letter also dated June 30, 2003.  He

---

[3]SCO policy stated that all "[r]eentering students are subject to all curriculum requirements, fee schedules, and other policies in effect for other students at the re-entrant's current year-level."  SCO's general policy on auditing courses stated that "[a]uditors are not required to prepare lessons or papers, take examinations, or take part in class discussions or laboratory work."  Rutherford argued that his dismissal was improper because his readmission letter did not state in writing that he was required to make a "C" in audited courses.  He contended that he remained subject to the normal policies of SCO in this aspect.  His interpretation of SCO policy would not have required him to take examinations and would not have permitted or required him to receive grades in audited courses.

expressly agreed to revise Rutherford's transcript to indicate withdrawal and further agreed to write a "letter of good standing." Each party initially acted in furtherance of the agreement. Rutherford dropped his academic appeal, withdrew from SCO, and pursued transfer to another school of optometry. Dr. Cochran provided a letter of good standing and a revised transcript, which he mailed to other optometry schools at Rutherford's request. Rutherford reflected this arrangement in an email to the dean of Inter American University of Puerto Rico School of Optometry. Rutherford attempted to reopen the appeals process only after he was unable to transfer to another school of optometry. Rutherford contended that he was unable to transfer because SCO mailed transcripts marked "dismissed" to several schools. After SCO maintained that Rutherford had no right to appeal, Rutherford filed suit.

Rutherford's complaint alleged, *inter alia*, that he was improperly dismissed in violation of school policy, that SCO allowed him to withdraw with full knowledge that he would be unable to transfer to another school, that SCO improperly mailed transcripts to other schools indicating that he had been dismissed, and that SCO denied him an opportunity to appeal to its Board of Trustees.[4] His complaint included claims for breach of contract and "intentional, wrongful, and negligent conduct."[5] Rutherford's prayer for relief requested judgment against SCO for lost wages, tuition, and other expenses in the amount of $500,000; reinstatement as a full time student in good standing at SCO; and all further equitable and legal relief that the court should deem just and proper.

SCO responded with an answer and counter-complaint. SCO specifically offered as a defense to Rutherford's claims the fact that Rutherford agreed to withdraw from SCO in consideration of having his transcript reflect his status as "withdrawn" rather than "dismissed."[6] SCO asserted in its counter-complaint that the parties agreed to settle their differences arising out of Rutherford's dismissal and that Rutherford violated the terms of the settlement agreement by filing suit. SCO sought damages for breach of contract and enforcement of the parties' settlement agreement. Rutherford denied SCO's allegations in his answer to the counter-complaint, asserting that the parties' communications never implied that he would agree to accept the decision of SCO regarding his dismissal or that he would be unable to file a lawsuit.

The parties argued their case before a jury in the spring of 2008. Prior to submission of the case to the jury, the parties agreed upon a jury verdict form that the trial court drafted after discussion with counsel. The jury answered the agreed verdict form as follows:

---

[4]Although Rutherford did not expressly sue to enforce the parties agreement, he did acknowledge in his complaint that "SCO President, Dr. Cochran, agreed to re-instate Plaintiff as a student in good standing and not impede Plaintiff's transfer to another school if Plaintiff would withdraw from SCO."

[5]Rutherford did not pursue his claims for negligent and intentional conduct before the trial court or on appeal.

[6]Rutherford did not challenge before the trial court and does not challenge here the manner in which SCO raised the agreement to settle as a defense to recovery.

1.  Did the dismissal of Aaron Benjamin Rutherford from the Southern College of Optometry violate the policies of the Southern College of Optometry as set forth in the proof which has been presented to you?

    Yes _X_        No ___

    If you answer is "no", stop here, sign the verdict form and return to the Court. If you answer "yes", proceed to Question 2.
    (Plaintiff has the burden of proof)

2.  Did Aaron Benjamin Rutherford and the Southern College of Optometry agree to settle any differences they may have had as set forth in the proof which has been presented to you?

    Yes _X_        No ___

    If you answer is "no", stop here, sign the verdict form and return to the Court. If you answer "yes", proceed to Question 3.
    (Defendant has the burden of proof)

3.  If there was an agreement to settle any differences which Aaron Benjamin Rutherford and the Southern College of Optometry may have had as set forth in the proof which has been presented to you, was the agreement breached by:

    A.  Aaron Benjamin Rutherford
    Yes ___        No _X_
    (Defendant has the burden of proof)

    B.  The Southern College of Optometry
    Yes ___        No _X_
    (Plaintiff has the burden of proof)

Neither party objected to the jury's verdict prior to the entry of judgment in favor of SCO.

Rutherford thereafter filed a motion for new trial and/or judgment notwithstanding the verdict. Rutherford argued that material evidence did not support the jury's verdict, which he asserted was inconsistent. SCO filed its own motion to alter or amend the judgment or for a new trial on the question of whether SCO violated school policy when it dismissed Rutherford. The trial court denied both motions and this appeal ensued.

## II. Issues Presented

The parties collectively raise the following issues for our review as restated:

(1)     Whether material evidence supports the jury's finding that SCO breached its policies and procedures when it dismissed Rutherford;

(2)     Whether material evidence supports the jury's finding that Rutherford and SCO contracted to settle any differences they may have had as set forth in the proof;

(3)     Whether material evidence supports the jury's finding that SCO did not breach the parties' agreement; and

(4)     Whether the jury rendered an inconsistent verdict?

### III.  Standard of Review

This Court will set aside a jury's findings of fact in a civil dispute only if there is no material evidence to support the verdict.  Tenn R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006).  The material evidence standard is heavily weighted in favor of the jury's determination:

> When addressing whether there is material evidence to support a verdict, an appellate court shall: (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence.  Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies.  If the record contains "any material evidence to support the verdict, [the jury's findings] must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury."

*Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704-05 (Tenn. 2000) (alteration in original) (citations omitted).  Questions of law do not enjoy similar deference.  This Court reviews the legal conclusions of a trial court *de novo* with no presumption of correctness. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696-97 (Tenn. 2002).

### IV.  Analysis

We first consider the argument of the cross-appellant, SCO, on the question of whether material evidence supports the jury's finding that SCO breached school policy when it dismissed Rutherford.  SCO argues that the terms of Rutherford's readmission required that he make a "C" in *any course* including audited courses and submits that SCO's general audit policy did not apply to Rutherford.  SCO posits that it rightly dismissed Rutherford for failure to adhere to the requirements of his readmission.  We disagree and hold that material evidence supports the jury's finding that SCO breached school policy when it dismissed Rutherford.

It is clear that SCO's readmission policy permitted the imposition of specific conditions of reentry. SCO policy, however, also mandated that any requirement in excess of the generally applicable standards for first-time students be specified in writing. Dean Hauser acknowledged at trial that SCO never advised Rutherford in writing that he would receive grades in audited courses. Dean Hauser further admitted that in the fall of 2002 he removed a grade erroneously received in an audited class from Rutherford's transcript. The removal of this grade was consistent with Rutherford's belief that he would not receive grades in his audited courses as expressed in his testimony and communications with professors. Rutherford's belief was also consistent with past history; no student had ever received a grade in an audited course during the twenty-four-year tenure of Dr. Cochran as President of SCO. Thus, ample evidence supports Rutherford's contention that he remained subject to SCO's general audit policy.

The expert testimony of Noel Schwartz ("Ms. Schwartz"), long-time registrar at the University of Memphis, further buttresses Rutherford's position.[7] Ms. Schwartz explained that an audit course by definition is not taken for a grade; audit courses are instead taken to supplement a student's knowledge and do not count towards a student's degree requirements. She opined that Rutherford's readmission letter obligated him to receive a "C" in any *graded course*. While she acknowledged SCO had the right to require Rutherford to earn grades in an audited course, Ms. Schwartz concluded that Rutherford's readmission letter lacked clarity and completeness on this issue.

In the absence of a validly imposed special condition, Rutherford remained subject to the general audit policy of SCO:

> Auditors are not required to prepare lessons or papers, take examinations, or take part in class discussions or laboratory work. No credit is granted and no grade is assigned for a course which is audited, nor are official records of audited courses retained by the College.

This policy makes clear that Rutherford should not have received grades in his audited courses. The only course that should have counted towards his readmission requirements was a clinical course in which he earned the requisite "C" or better. Ms. Schwartz concurred in this assessment. She testified that at the time of dismissal Rutherford was in good standing based on the grades reported in his official transcript. SCO's decision to dismiss Rutherford was contrary to her experience; she had never seen a student receive a grade in an audited course. We hold that material evidence supports the jury's finding that SCO violated school policy when it dismissed Rutherford.

The next question is whether, in light of its breach of policy, SCO entered into an

---

[7]Ms. Schwartz explained that as registrar she was responsible for the maintenance of a student's transcript, which reflects a student's academic progress and degrees earned. Her duties as registrar also involved the administration of school policy including academic regulations.

agreement with Rutherford to settle the parties' differences as set forth in the proof.[8]  This Court has described the requirements of a valid contract thus:

> It is well established in Tennessee that, in order to be enforceable, a contract must represent mutual assent to its terms, be supported by sufficient consideration, be free from fraud and undue influence, be sufficiently definite, and must not be contrary to public policy. *Johnson v. Central Nat'l Ins. Co.*, 210 Tenn. 24, 356 S.W.2d 277, 281 (1961).  Such a contract can be expressed or implied, written or oral. *Id.*  A written contract does not have to be signed to be binding on the parties. *See Remco Equip. Sales, Inc. v. Manz*, 952 S.W.2d 437, 439 (Tenn. Ct. App. 1997). . . . What is critical is mutual assent to be bound.  In determining mutuality of assent, courts use an objective standard based on the manifestations of the parties.  11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 30:6 (4th ed. 1999).  Assent can be established by the course of dealing of the parties. *Remco Equip. Sales*, 952 S.W.2d at 439.  In determining whether a contract exists, the court also can consider relevant evidence such as whether the parties performed under its terms.  11 Williston & Lord, § 30:3.

*T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 865-66 (Tenn. Ct. App. 2002).  Despite Rutherford's arguments to the contrary, material evidence in the record shows that the parties entered into a valid contract to settle the dispute arising out of his dismissal.

The record shows that Rutherford initially approached SCO and proposed an agreement to remedy his dismissal–the same dismissal that now serves as the basis of his claim in breach of contract.  The parties later met to negotiate the terms of the proposed settlement and eventually struck an accord.  Rutherford incorporated the terms of the parties' negotiated agreement into a second offer, which he delivered to Dr. Cochran by letter.  Rutherford's second offer requested that Dr. Cochran assume the following obligations:  (1) to rescind Rutherford's dismissal, (2) to change his status to withdraw passing, (3) to write a letter of recommendation stating that he remained in good standing, and (4) to ensure that no one associated with SCO would impede his transfer or application to other schools.  Dr. Cochran accepted Rutherford's offer, a fact that Rutherford acknowledges in his complaint.  In consideration of the agreement, Dr. Cochran took multiple steps in furtherance of Rutherford's transfer for which he had no legal obligation; Rutherford dropped his appeal and withdrew from SCO. *See Kozy v. Werle*, 902 S.W.2d 404,

---

[8]We note that parties limited their proof at trial to the alleged breach of contract based on SCO's violation of its policies and procedures and the formation of the parties' agreement to settle.  Additionally, Rutherford concedes in his brief that "[i]f there was an agreement in this case, it was intended to resolve the fact that SCO failed to follow its' [sic] own policies and procedures and wrongly dismissed Mr. Rutherford for failing two audited courses."  Thus, the "any differences" contemplated in the jury verdict form appears to relate to the issues underlying Rutherford's present claim for breach of contract.  This construction of the jury verdict form is consistent with our analysis of the issue *infra*.

411 (Tenn. Ct. App. 1995) (citing *Brown Oil Co., Inc. v. Johnson*, 689 S.W.2d 149 (Tenn. 1985) ("Consideration consists when the promisee does something that he is under no legal obligation to do or refrains from doing which he has a legal right to do."). Each party thereafter acted in furtherance of the agreement. Thus, material evidence exists to support the jury's finding of an enforceable contract.

We are not persuaded that the contract is too indefinite to be enforced. Rutherford primarily challenges his use of the phrase "will not impede my transfer," which he argues is not sufficiently explicit to allow a court to determine the respective obligations of the parties. We disagree. The term "impede" is defined as "to interfere with or slow the progress of." *Webster's Ninth New Collegiate Dictionary* 603 (1991). The plain meaning of the parties' agreement, which is consistent with the parties' intent, prohibited SCO from interfering with or slowing the progress of Rutherford's transfer. Further, Rutherford admitted at trial that SCO carried through its obligation not to impede his transfer. We believe the terms of the parties contract were reasonably certain and created a binding contract between the parties.

We disagree with Rutherford's assertion that the parties did not reach an understanding on the type of letter Dr. Cochran agreed to provide. We recognize that Rutherford initially demanded a letter of recommendation from Dr. Cochran, but he later capitulated and requested a "letter of recommendation that must state that I am in good standing." His second request, despite its literal wording, occurred after Dr. Cochran informed Rutherford he would not write a letter of recommendation on Rutherford's behalf and is therefore best characterized as a request for a letter of good standing. In his acceptance, Dr. Cochran agreed to write a letter of good standing and forwarded the same to Rutherford. Rutherford initially did not dispute Dr. Cochran's compliance with the terms of their agreement. Rather, an email to the dean of Inter American University of Puerto Rico School of Optometry shows that Rutherford approximated the letter he received with the requested letter of recommendation stating he was in good standing. When considered in its entirety, the evidence at trial shows the parties mutually agreed upon all essential terms of the contract resolving their dispute.

We conclude that material evidence supports the jury's finding that the parties contracted to settle any differences they may have had as presented in the proof. "It is well settled that a binding contract may be entered into through the medium of correspondence by letter or telegraph." *Neilson & Kittle Canning Co. v. F.G. Lowe & Co.*, 260 S.W. 142, 143 (Tenn. 1924). This Court has explained that when determining whether such correspondence should be construed as a binding contract:

> "[t]he primary test as to the actual character of a contract is the intention of the parties, to be gathered from the whole scope and effect of the language used, and mere verbal formulas, if inconsistent with the real intention, are to be disregarded. It does not matter by what name the parties chose to designate it. But the existence of a contract, the meeting of the minds, the intention to assume an

-9-

obligation, and the understanding are to be determined in case of doubt not alone from the words used, but also the situation, acts, and the conduct of the parties, and the attendant circumstances."

*Gurley v. King*, 183 S.W.3d 30, 43 (Tenn. Ct. App. 2005) (alteration in original) (quoting 17 Am. Jur. 2d *Contracts* § 1 (1964)). Our review of the record shows that the parties intended to contract, sufficiently defined the terms of their contract, and acted in furtherance of the contract. Any disagreement over SCO's fulfillment of its contractual duties occurred only after the parties formed a valid contract. We agree with SCO's assertion that subsequent activity contrary to a valid contract does not necessarily mean that there was no contract, although it may give rise to a claim for breach and enforcement of the contract. *See DePasquale v. Chamberlain*, 282 S.W.3d 47 (Tenn. Ct. App. 2008) (reviewing alleged breaches of the parties' settlement agreement).

Material evidence also supports the jury's finding that SCO did not breach the parties' agreement. As previously explained, Dr. Cochran did not violate the parties' agreement when he provided Rutherford with a letter of good standing. The additional question of whether Rutherford violated the terms of the agreement was relevant only as to the SCO's counterclaim, which SCO dismissed before the jury retired; that question is moot. *See County of Shelby v. McWherter*, 936 S.W.2d 923, 931 (Tenn. Ct. App. 1996) ("To avoid being dismissed as moot, cases or issues must be justiciable not only when a case is first filed but must remain justiciable throughout the entire course of the litigation, including the appeal."). We therefore limit our analysis of this issue to the question of whether SCO breached the agreement when it mailed transcripts bearing the notation "dismissed" to other optometry schools.

As SCO points out, it is important to consider the timing of the alleged breach. Soon after Rutherford learned of his dismissal, he went to the registrar's office to review his transcript. The copy he received, which was printed prior to official notification of his dismissal, did not contain a notation that he had been "dismissed." Dean Hauser testified that Rutherford asked him if the transcript was accurate. He responded that the transcript was accurate at the moment, but notified Rutherford that his transcript could change at any minute depending on the outcome of the pending decision on his dismissal. Rutherford nevertheless ordered copies of his transcript sent to other optometry schools. An email to another optometry school on June 29, 2003, shows that Rutherford knew prior to the parties' agreement that transcripts marked "dismissed" had been sent out. The email further indicates his anticipation that a second, corrected transcript marked "withdrawn" would soon arrive. Rutherford ultimately admitted he could not prove that transcripts sent after the June 30th agreement contained the term "dismissed." None of the various versions of the transcript in the record establish that SCO mailed a transcript bearing the notation "dismissed" after the parties entered into their agreement. The record indicates that the transcripts marked "dismissed" sent to other schools were only mailed before the parties agreed to settle their differences on June 30, 2003. We hold that material evidence supports the jury's finding that SCO did not breach the parties' agreement.

Our final consideration is whether the jury rendered an inconsistent verdict. "Tennessee

law is well-established that litigants are entitled to have their rights settled by a consistent and intelligible verdict and that verdicts that are inconsistent and irreconcilable cannot stand." *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 911 (Tenn. 1999) (citations omitted). It is the duty of this Court to reverse and remand the judgment of the lower court for a new trial if we conclude that the judgment is based on an inconsistent jury verdict. *Id.* A countervailing duty exists, however, to "whenever possible, give effect to a jury's verdict." *In re Estate of Marks*, 187 S.W.3d 21, 32 (Tenn. Ct. App. 2005) (citation omitted). Cases involving inconsistent jury verdicts are no exception:

> It is the duty of the court in construing verdicts to give them the most favorable interpretation and to give effect to the intention of the jurors if that intention be permissible under the law and ascertainable from the phraseology of the verdict. If after an examination of the terms of the verdict the court is able to place a construction thereon that will uphold it, it is encumbent [sic] upon the court to do so.

*Templeton v. Quarles*, 374 S.W.2d 654, 660 (Tenn. Ct. App. 1963) (citations omitted); *see also Tip's Package Store, Inc. v. Commercial Ins. Managers, Inc.*, 86 S.W.3d 543, 560 (Tenn. Ct. App. 2001) (holding that the lower court "properly reconciled any apparent inconsistencies" in a jury's verdict).

Rutherford submits that judgment in favor of SCO cannot stand as a matter of law due to an alleged contradiction between the jury's findings that (a) the parties agreed to settle all their differences and (b) Rutherford did not breach the agreement when he filed suit. Rutherford's interpretation of the jury's verdict assumes that the parties' agreement included an express bar against filing suit. It is possible that the parties agreed to settle any differences arising out of Rutherford's dismissal without expressly prohibiting Rutherford from filing suit. In such event, the agreement would operate as an affirmative defense to recovery rather than a bar to the action itself.[9] *See* Tenn. R. Civ. P. 8.03 (noting that the doctrines of release as well as the doctrine of accord and satisfaction operate as affirmatives defenses); *see also Marlett v. Thomason*, No. M2006-00038-COA-R3-CV, 2007 WL 1048950, at *5 (Tenn. Ct. App. Apr. 5, 2007) (*no perm. app. filed*) (describing compromise, settlement, and release as affirmative defenses). This construction is consistent with the evidence in the record and the trial court's entry of judgment in favor of SCO based on the agreement to settle. We conclude that the jury's verdict, as construed, is not inconsistent and therefore capable of supporting the trial court's judgment.

---

[9]The parties have variously described the parties' contract a "settlement agreement," "release," "accord and satisfaction," et cetera. No matter the label accorded the agreement, the parties contracted to resolve any differences they may have had, which is in our view is the type of contract that may serve as an affirmative defense to a plaintiff's recovery on the previously-owed obligation. *See Quebecor Printing Corp. v. L & B Mfg. Co.*, 209 S.W.3d 565, 582 (Tenn. Ct. App. 2006) (holding that the a "settlement agreement" extinguished the defendant's underlying obligation).

## V. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.  Costs of this appeal are taxed to the appellant, Aaron Rutherford, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE